MORRIS et al. v. EAST SIDE RY. CO. et al.

MAXWELL v. SAME.

(Circuit Court, D. Oregon. June 24, 1899.)

PLEDGES—COLLUSIVE SALE OF COLLATERAL—RIGHTS OF PURCHASER.

An issue of $300,000 of bonds of a street-railway company were pledged to a bank to secure notes for $163,000, the loan being, in effect, made to the company. After maturity, and pending the foreclosure of a second mortgage given by the company, the bank transferred the notes and collateral to a second party, who at once advertised and sold the bonds under the terms of the pledge. They were purchased for $173,000, which was less than the amount of the debt, of which the purchaser paid down $10,000, borrowing the amount necessary to complete the payment on the next day and a day or two later, in accordance with a prior arrangement, borrowing the money to repay such loan from the bank which was the original pledgee on a rehypothecation of the bonds. Held, that the circumstances of the entire transaction indicated that it was not the purpose of the bank, by the sale of the collateral, to realize its debt, but that such sale was contrived to obtain the title of the pledgor to the bonds at a sacrifice for the benefit of either the bank or the purchaser, and in either case the holder would be permitted to enforce them, as against the company or its creditors, only to the extent of the debt secured.

These are suits in equity to foreclose a mortgage on the property of the East Side Railway Company.

Ralph E. Moody, for Morris & Whitehead.
Wirt Minor, for A. L. Maxwell, trustee.
W. A. Cleland, for East Side Ry. Co.
Milton W. Smith and W. S. Goodfellow, for German Savings & Loan Soc.

A. H. Tanner, for Charles F. Albee.

Thomas N. Strong, for Washburn & Moen Mfg. Co.

BELLINGER, District Judge.    The East Side Railway Company is a corporation organized and controlled by James and G. A. Steel. Prior to September, 1892, the Steels had borrowed money of the German Savings & Loan Society upon the security of bonds of the railway company, and in that month their indebtedness to the loan society was increased by an additional loan to $83,000, for which they pledged 125 bonds of the railway company, of the par value of $1,000. This was one-half of the bonds that the railway company was authorized to issue.    These bonds were secured by a mortgage to the Security Savings & Trust Company, as trustee.    Thereafter, in February, 1893, the directors of the railway company authorized the issue of 300 bonds, of $1,000 each, secured as aforesaid, to take the place of the issue already authorized.    Of the bonds so authorized 156 were issued to the Steels, and pledged by them to secure the existing debt to the loan society, for which a new note was executed, bearing date April 1, 1893, and the remaining bonds, 144 in number, were pledged to the loan society for a further loan of $80,000, for which the Steels gave a second note, dated April 1, 1893.    The bonds pledged to secure the $83,000 note are described therein as numbered from 145 to 300, inclusive, while those pledged in the $80,000 are described as numbered from 1 to 144, inclusive.    It is contended for the Steels and the railway company that the $80,000 is the debt of the company, and not of the Steels, who were required to give their individual note for the loan upon the advice of the attorney of the loan society that the railway company could not borrow money on its own bonds in this way, and that the understanding at the time was that bonds numbered from 145 to 300, inclusive, were pledged for the $80,000 debt by the railway company, or in its behalf, and that these were otherwise unissued treasury bonds of the company.    On the other hand, it is contended that the two notes for $83,000 and $80,000, respectively, are in effect for one debt of the aggregate sum of $163,000, to secure which debt the entire issue of the bonds of the company are pledged, without distinction as to ownership or issue, but upon the assumption that said bonds were, and that they in fact were, the property of James and G. A. Steel; that all the bonds authorized by the company had been issued to the said Steels, and were their property at the time the loan was negotiated.    In November, 1893, the railway company executed a second mortgage to the Northwest General Electric Company to secure $37,639.95 then due that company, and further advances to an additional amount not exceeding $25,000, and, further, to secure the sum of $29,289 due from the railway company to the Commercial National Bank.    This suit was begun by the electric company in December, 1893, to foreclose this second mortgage, and Joseph Simon was appointed receiver of the railway company's property.    In the meantime the bonds pledged to secure the Steel notes were sold at auction, in San Francisco, in pursuance of notice duly given, and were purchased by Morris & Whitehead, bankers, parties herein.    After their purchase, A. L. Maxwell

was substituted as trustee in the first mortgage for the Security Savings & Trust Company, and in that capacity brings his bill of complaint, in the nature of a cross bill herein, against the East Side Railway Company, to foreclose the said first mortgage.

The principal question that arises in the case involves the validity of this sale of bonds made in San Francisco,—the contention of the Steels and of the railway company being that the sale to Morris & Whitehead is a mere pretense, designed for the purpose of enabling the German Savings & Loan Society to foreclose for the face value of the bonds, instead of the amount due upon the notes, for which the bonds were pledged; and, furthermore, that the hypothecation of the unissued bonds, 156 to 300, inclusive, was unauthorized, the company being without authority to make such hypothecation; that the debt for which these bonds were hypothecated was that of the company, and not of the Steels, and, if such bonds were lawfully hypothecated, still their sale in the mode employed was unauthorized and void. The answer made to this is that the sale to Morris & Whitehead is bona fide; that the German Savings & Loan Society has no interest in the sale, but that it is immaterial as to this, for the reason that the latter might, as is claimed, have purchased the bonds at its own sale, under the power given it. As to the contention that bonds 156 to 300, inclusive, were unissued treasury bonds, and were not authorized to be sold in the mode employed, it is answered that there is no distinction as to the bonds and notes; that the two notes are evidences of one debt, and that the debt of the Steels; and that all the bonds pledged were their property; and, further, that it is immaterial whether the note for $80,000 is for the debt of the East Side Railway Company, or whether bonds 156 to 300, inclusive, were treasury bonds or not, because (1) the Steels are the owners of practically all the stock of the railway company, and are therefore, in equity, the owners of the company's bonds, and (2) that neither the German Savings & Loan Society nor Morris & Whitehead had notice that the $80,000 was for a company debt, or that the bonds referred to had not been issued. As to the issues of fact thus presented, the testimony of the officers of the German Savings & Loan Society, and of the managing member of the firm of Morris & Whitehead, is most positive that the former have no interest whatever in the purchase made by the latter. This testimony is uncontradicted, unless the circumstances of the case are against it. In July, 1897, the Steels applied to Morris & Whitehead to purchase bonds of the East Side Railway, and at the time furnished them a detailed statement of the company's affairs, its earnings and expenses, and business plans. The company was then in the hands of a receiver in the suit of the Northwest General Electric Company to foreclose a second mortgage held by it. James Steel testifies that he had a conversation with Mr. Morris, of Morris & Whitehead, about this time, in which he advised Mr. Morris that the electric company's mortgage was the key to the situation, and expressed the opinion that this claim could be purchased for much less than its face; that Mr. Morris said he thought he could work the matter through; that it was a good proposition; that thereafter, on the arrival of Mr. Morris' brother from the East, the witness and his brother took a private

car, and went over the road with the two Morrises and their attorney; that they seemed well pleased, and talked very favorably of being able to negotiate the matter proposed; that later he saw Mr. Morris a few times, and he still talked favorably, but there came a time when, hearing nothing further from Mr. Morris, the witness thought that "the whole thing had been dropped," until he heard one day that Morris & Whitehead had bought the electric company's mortgage. It transpired that Morris & Whitehead bought the mortgage referred to on March 31, 1898, and were thereupon substituted as parties in the pending foreclosure. The loan society transferred the Steel notes and bonds to Albert Meyer on April 26th. On the 27th Meyer addressed a letter to the Steels, the East Side Railway Company, and divers creditors of such company, demanding payment of the Steel notes, and on the same day published notice of the proposed sale of bonds to take place on May 11th. This notice of sale accompanied the demand of payment made as above stated. The bonds were bid in by Morris & Whitehead for $173,589. Meyer, to whom the bonds and notes had been transferred by the German Savings & Loan Society, transferred the bonds on that day to the purchaser, and reassigned the notes to the loan society. The latter on the following day, May 12th, assigned the notes to Morris & Whitehead in consideration of the payment of $4,970.10. This was the sum still due on the notes after deducting therefrom the price bid for the bonds. At the time of the sale Mr. Morris gave Meyer a check for $10,000 "to bind the bargain." Thereafter, on the same or the succeeding day, the balance of the purchase price of the bonds, $163,589, was paid by a check drawn by Wells, Fargo & Co. in favor of F. S. Morris, and indorsed to Meyer. Meyer paid the German Savings & Loan Society by his own check, drawn on the London & Paris American Bank. This check was collected a day or two after the sale. The money represented by the Wells, Fargo & Co.'s check to F. S. Morris, used in completing the payment to Meyer, was obtained upon a short loan from that company to Morris & Whitehead, for which the bonds were pledged as security, and this loan was paid "a day or two after the sale." The money with which to make the payment to Wells, Fargo & Co. by Morris & Whitehead was borrowed by Morris & Whitehead from the German Savings & Loan Society upon the security of the bonds, a couple of days after the sale, in pursuance of an arrangement made some days before the sale. The collection by the German Savings & Loan Society of the Meyer check, representing the purchase price of the bonds (with the exception of $10,000), the repayment of the loan from Wells, Fargo & Co. to Morris & Whitehead, which was represented by Wells, Fargo & Co.'s check indorsed to Meyer, and the loan to Morris & Whitehead by the German Savings & Loan Society, all took place "a day or two after" or "a couple of days after" the sale. In other words, Wells, Fargo & Co. were repaid their loan at about the same time that the money derived therefrom was paid to the German Savings & Loan Society, and the latter at the same time loaned Morris & Whitehead the money to pay Wells, Fargo & Co. for their loan to pay the German Savings & Loan Society. The real character of the transaction shows through all this circumlocution. The Ger-

man Savings & Loan Society was not seeking to realize upon its securities, but to effect a transfer of the title of the bonds held by it to Morris & Whitehead. The sale, if it can be so called, was not a cash sale, as advertised, except as to the $10,000, which, when the amount involved is considered, appears to be too small a sum to have operated as an inducement for what was done. The debt of the Steels, except as to $4,970, was simply transferred to Morris & Whitehead. I am satisfied that the solvency of these bankers was not an inducement for the transfer. The security for the debt was the bonds. The German Savings & Loan Society was merely playing into the hands of Morris & Whitehead, and, if the former has no pecuniary share in the title derived from the sale, yet its conduct has all the consequences of such an interest to the debtors whose property was sold. But whether the pledgor may buy at his own sale is not considered. It is enough to defeat the sale that it was contrived between the seller and buyer, in order to get the pledgor's title at a sacrifice of his interest, with that result. I am of the opinion that the purchasers of these bonds are only entitled to a decree for the amount of the debts for which the bonds were pledged, and interest and costs; and this conclusion is based upon the fact that the sale to Morris & Whitehead was prearranged between the parties, that it was contrived between them as a means of acquiring the property pledged, and that it is immaterial whether the German Savings & Loan Society have any interest in the sale or not. In reaching this conclusion, I assume, from the earning capacity of the railway as shown by what appears in the case, that the bonds have a value greatly in excess of the price bid for them at the sale. If this is so, it is unconscionable that the mortgagors, or, what is the same thing, the other creditors, shall lose this excess by the expedient of this sale, while some $5,000 of the original debt remains unsatisfied in the hands of the purchasers at the sale. If it shall turn out that the price bid is substantially all that the bonds are worth, then the considerations upon which this decree is based will fail. In that case the sale could not have prejudiced the mortgagors and other creditors, but in that case the purchasers at the sale will not be prejudiced by the decree. In any event they will have their debt and interest, whether that is sufficient to absorb the property or not; and it is all they are equitably entitled to have. This decree in favor of the complainants, as aforesaid, has priority over the several judgments pleaded in this suit. I am of the opinion that the substitution of A. L. Maxwell for the Security Savings & Trust Company, as trustee, was authorized, and that such trustee and his attorney are entitled to compensation for their services in this suit.

The other questions involved herein are reserved for further consideration.